Mary **GLOVER**, Lynda Gates, Jimmie Ann Brown, Jane Doe, Manette Gant, Jacalyn M. Settles, Plaintiffs–Appellees,

v.

Perry **JOHNSON**; Florence R. Crane; G. Robert Cotton; Thomas K. Eardley, Jr.; B. James George, Jr.; Duane L. Waters; William Kim; Robert Brown, Jr.; Frank Beetham; Richard Nelson; Gloria Richardson; Dorothy Costen; Ronald Keim, Defendants–Appellants.

Nos. 89–2191, 89–2421.

United States Court of Appeals, Sixth Circuit.

Argued May 8, 1991.

Decided May 30, 1991.

Deborah A. Labelle (argued), Charlene M. Snow, Detroit, Mich., for plaintiffs-appellees.

Theodore E. Hughes, Richard M.C. Adams, Asst. Atty. Gen., Susan Przekop-Shaw (argued), Office of the Atty. Gen., Corrections Div., Lansing, Mich., for defendants-appellants.

Before KENNEDY and RYAN, Circuit Judges, and EDWARDS, Senior Circuit Judge.

RYAN, Circuit Judge.

These consolidated appeals from eleven-year-old prisoner rights litigation are concerned with the district court's effort to require the Michigan corrections authorities to provide to female prison inmates educational and vocational opportunities comparable to those offered to male inmates.

In No. 89–2191, defendants, the director of the Michigan Department of Corrections, members of the Michigan Corrections Commission, and other prison officials, appeal the district court's order finding defendants in civil contempt and ordering remedies for failing to provide those opportunities as ordered by the court ten years ago. In No. 89–2421, defendants appeal the at-torneys' fees award for services plaintiffs' counsel performed in 1987 and 1989.

For the reasons we shall discuss, we find that the district court did not abuse its discretion in holding defendants in contempt for noncompliance with the court's 1981 order. We also conclude that the district court's order requiring defendants to appoint a special administrator to develop a remedial plan is not an excessively intrusive remedy. Finally, plaintiffs are entitled to attorneys' fees as awarded by the district court.

I.

We decline to burden this opinion with still another account of the lengthy factual and legal history of this case. Instead, what follows is a recitation of so much of the history of the controversy as is necessary for an understanding of the specific issues before us today. The reader interested in all of the details may wish to consult *Glover v. Johnson*, 478 F.Supp. 1075 (E.D.Mich.1979); *Glover v. Johnson*, 510 F.Supp. 1019 (E.D.Mich.1981); *Glover v. Johnson*, 855 F.2d 277 (6th Cir.1988); and *Glover v. Johnson*, 721 F.Supp. 808 (E.D.Mich.1989), in that order.

In May 1977, female inmates in the custody of the Michigan Department of Corrections filed a class action suit against the director of the Michigan Department of Corrections, members of the Michigan Corrections Commission, and other prison officials alleging that female inmates at Michigan prisons were not being provided educational and vocational training opportunities which were being provided to male inmates, in violation of the Equal Protection Clause of the Fourteenth Amendment. The suit was later consolidated with another class action brought on behalf of female inmates at Michigan prisons alleging denial of a right of access to the courts. The consolidated class action was certified by the district court "on behalf of all female inmates in Michigan." *Glover v. Johnson*, 85 F.R.D. 1, 2 (E.D.Mich.1977).

In 1979, following a bench trial, the district court found that the disparity in edu-

cational and vocational opportunities available to female inmates compared to those available to male inmates violated the Equal Protection Clause of the Fourteenth Amendment. The court also held that meaningful access to the courts was not afforded to female inmates because of the dearth of female inmates skilled in legal procedures. The court's 1979 order set forth in general terms the remedies defendants would be required to implement and it directed the defendants to submit a plan detailing steps to be taken to comply with the order.

In 1981, the district court issued a final order. The 1981 order was the culmination of extensive negotiations and was agreed to by the parties. The district court later summarized its 1979 and 1981 orders as follows:

> In addition to paralegal training, my orders require the [defendants] to provide female inmates with post-secondary education, to implement various vocational and apprenticeship programs, to make use of off-grounds and work pass programs with eligible prisoners, to establish prison industry programs, to pay back wages to a trust fund established for the benefit of the women prisoners, and to re-evaluate and standardize the prisoner wage scale used by the [defendants] to assure that it is applied to women fairly.

*Glover*, 721 F.Supp. at 811. Neither the 1979 nor the 1981 order was appealed, with the result that the finding of equal protection violations is the law of the case.

In June 1985, the district court granted plaintiffs' motion for contempt with respect to wages paid paralegals at Huron Valley Women's Facility. The court ordered defendants to pay inmate paralegal trustees at Huron Valley $1.50 per day.

In January 1986, plaintiffs filed a second contempt motion against defendants for failing to comply with the court's 1979 and 1981 orders. The ensuing contempt proceedings prompted defendants to arrange with Spring Arbor College, a private degree-granting institution located not far from the State Prison of Southern Michi-

gan, to provide two baccalaureate courses at Huron Valley. *Id.* However, no arrangement was made for similar course offerings at Florence Crane Correctional Facility, a female prison facility which opened in April 1985. As a result, in October 1986, the district court issued a preliminary injunction ordering defendants to provide baccalaureate courses at both Huron Valley and Crane.

In 1987, the district court found that defendants failed to provide the post-secondary degree programming ordered in 1979 and 1981 and failed to implement baccalaureate programs comparable to those offered to male inmates. The district court, displeased with defendants' lack of compliance with its earlier orders, concluded that "ordinary contempt penalties will not bring compliance" and ordered a court administrator be appointed to "design and implement educational programs for female inmates on a parity with male inmates." *Glover v. Johnson*, 659 F.Supp. 621, 623 (E.D.Mich.1987). This 1987 order was appealed along with the 1986 injunctive order requiring defendants to provide a four-year degree program at Huron Valley and Crane.

On appeal, we vacated the injunctive order as not supported by sufficient findings of fact, and we set aside the order appointing an administrator finding insufficient evidentiary support to justify such an extreme intrusion into the constitutional prerogative of a state agency. We also found that the district court abused its discretion by failing to enforce its order through a less intrusive means than a court-appointed administrator. We remanded for specific findings of fact regarding defendants' compliance with the 1981 order and the least intrusive means to accomplish compliance.

On remand, the district court found that defendants failed to comply with its 1979 and 1981 orders, determined that civil contempt remedies were ineffective, and ordered defendants to appoint an administrator to develop a remedial plan of compliance. In a lengthy and carefully crafted opinion, the district court addressed defendants' alleged failure to comply with the

court's orders concerning: (a) access to courts; (b) educational programming; (c) vocational programming; (d) apprenticeship opportunities; (e) prison industry, trust fund payments, and prisoner wages; and (f) off-grounds privileges and work pass programs.

The district court found that plaintiffs had proved by clear and convincing evidence that defendants disobeyed the court's orders and that defendants' failure to implement the court's 1979 and 1981 orders required a remedy. Because defendants had ignored the previous contempt citation and apparently remained unimpressed by threats of further contempt penalties, the court rejected traditional civil contempt sanctions as a satisfactory enforcement method. The district court stated:

> Fines or imprisonment are not the best remedies in this case. A remedy is needed which will result in parity. This elusive concept needs to be structured in this case by skillful individuals who can create programs which will meet the constitutional demand. The Department needs to be helped to provide parity.

721 F.Supp. at 849.

The court ordered defendant members of the Michigan Corrections Commission to hire a special administrator approved by the court and, within sixty days thereafter, to design and implement a remedial plan. The court stated its intention to appoint a monitor to oversee the administrator's and commissions' efforts. The court held that the remedy it fashioned was the least intrusive means to insure that defendants do what they have not done for the last ten years—provide parity in educational and vocational opportunities for female inmates. Defendants now appeal the district court's finding of contempt and the remedy imposed.

## II.

### A.

■ Defendants argue that the district court should have compared the programs offered female and male inmates to determine whether parity had been achieved and they claim that the failure to make such a comparison precluded a finding of an equal protection violation warranting the appointment of a special administrator.

Apparently defendants overlook the fact that the equal protection violation was found by the court in its 1979 and 1981 orders and those orders were not appealed. As we noted in an earlier appeal:

> [P]laintiffs' claims that they have been denied equal protection of the law under the fourteenth amendment by the defendants' failure to provide educational opportunities to women inmates in parity with those offered to male inmates is *not* at issue in this case. The plaintiffs have prevailed on that claim and the district court's 1979 judgment and 1981 judgment and final order so provide.

855 F.2d at 281 (emphasis added).

### B.

Defendants claim that in finding them in contempt, the court employed an incorrect legal standard and that plaintiffs must prove by clear and convincing evidence that defendants did not "substantially and diligently" comply with the court's 1979 and 1981 orders.

■ In a civil contempt proceeding, the petitioner must prove by clear and convincing evidence that the respondent violated the court's prior order. *NLRB v. Cincinnati Bronze, Inc.*, 829 F.2d 585, 590 (6th Cir.1987).

> A litigant may be held in contempt if his adversary shows by clear and convincing evidence that "he violate[d] a definite and specific order of the court requiring him to perform or refrain from performing a particular act or acts with knowledge of the court's order."

*Id.* at 591 (citation omitted).

Here, the district court applied the correct legal standard and found the evidence clear and convincing that defendants failed to comply with its orders.

### 1.

■ Defendants concede that some of the court's "goals" set forth in its 1979 and 1981 orders were not accomplished but contend that they have done all they can to comply with the district court's 1979 and 1981 orders and, therefore, should not be held in contempt.

In *Peppers v. Barry*, 873 F.2d 967, 969 (6th Cir.1989), this court held that the test is not whether defendants made a good faith effort at compliance but whether "the defendants took all reasonable steps within their power to comply with the court's order."

[G]ood faith is not a defense to civil contempt. Conversely, impossibility would be a defense to contempt, but the Department had the burden of proving impossibility, and that burden is difficult to meet. Although diligence is relevant to the question of ability to comply, the Department's evidence of diligence alone does not satisfy that burden.

*Fortin v. Commissioner of Mass. Dep't of Pub. Welfare*, 692 F.2d 790, 796–97 (1st Cir.1982) (citations omitted). "[I]nability to comply would be a defense ... but defendants would be expected ... to show this 'categorically and in detail,'" *Aspira of New York, Inc. v. Board of Educ. of New York*, 423 F.Supp. 647, 654 (S.D.N.Y.1976) (citation omitted).

Defendants simply did not convince the court that they took all reasonable steps to comply, and they do not convince us. Defendants contend they were unable to comply with the court's orders to any greater extent because the orders required the cooperation of colleges and educators outside their control. The district court found that defendants failed to make necessary improvements in educational programming which was under their direct control and it declined to excuse defendants' noncompliance with their constitutional obligations due to lack of cooperation of provider institutions when defendants had not explored or attempted any alternative solutions.

As the district court found in *Aspira*, 423 F.Supp. at 654:

Upon the facts disclosed in this proceeding, defendants have fallen far short of the requisite diligence. They have neglected to marshal their own resources, assert their high authority, and demand the results needed from subordinate persons and agencies in order to effectuate the course of action required by the consent decree. They have allowed deadlines to pass without advance announcements or volunteered explanations, awaiting complaints by the plaintiffs before even treating with the court concerning delinquencies. They have borne with seeming equanimity long periods of nonperformance, inadequate performance, or outright defiance from key constituents,.... They have displayed an evident sense of nonurgency bordering on indifference, contrasting vividly with the spurt of activity on the heals of plaintiffs' motion for a finding of contempt.

In this case, the district court found that defendants repeatedly ignored the court's orders and acted only after contempt proceedings were threatened. Its conclusions are, in that connection, amply supported in the record.

### 2.

■ Defendants also argue that the 1981 final order was ambiguous in three respects in that it required defendants: 1) to assist and cooperate in the establishment of four-year college programs; 2) to establish a systematic and coherent course package that culminates in an associate's degree; and 3) to provide paralegal education until there is a pool of adequately trained writ writers.

It suffices to say that the 1981 final order was a negotiated settlement between the parties. Defendants did not object to the language until now and have never asked the district court to clarify the purportedly ambiguous language. Moreover, we find the language unambiguous and, even if it were ambiguous, defendants' failure to request the court to clarify, explain, or modify the language in the decade since

the order was served precludes raising an ambiguity argument at this time.

### C.

Defendants contend the court could not rely on defendants' failure to institute programs at Crane because this court did not hold until 1988 that Crane inmates were part of the inmate class. Defendants also contend that the 1981 order dissolved the 1979 order so the court could not find contempt based on the 1979 order. Finally, defendants contend that the district court interpreted its 1981 order beyond its express terms. We address each argument in turn.

### 1.

■ Defendants claim the district court could not find them in contempt for failure to introduce programs at Crane because Crane inmates were not considered part of the class until this court's ruling in 1988.

In bringing this class action suit, plaintiffs sought to represent "all female penal inmates who are now, or may be in the future, incarcerated at the Huron Valley Women's Facility and at the Kalamazoo County Jail," a temporary placement facility used to relieve overcrowding at Huron Valley. *Glover*, 85 F.R.D. at 3. At the time the action was filed, these were the only female prison facilities in the state. Thus, the specification by name of the only institutions then housing female inmates as comprising the class of "all female inmates" was redundant and certainly was not intended to exclude those female inmates who, ten years later, would be housed at a new location. Moreover, the district court, when granting plaintiffs' motion for class certification, recognized that the class action was on behalf of "all female inmates" in Michigan including all future inmates who would come within the jurisdiction of the Department of Corrections. Defendants had reasonable notice that the class action encompassed all female inmates housed in state prison facilities.

Furthermore, in 1987, the district court specifically held that the constitutional requirements of parity apply to Crane since it houses female inmates and the action was filed on behalf of all female inmates in Michigan. This court agreed:

> Given the facts at the time of the class certification and the court's very explicit statement of its purpose in certifying the class, it is clear that the class consists of all women inmates, including inmates at the Florence Crane Facility,....

855 F.2d at 281.

Similarly, although the 1979 and 1981 court orders discuss only Huron Valley, defendants had reasonable notice that the conditions of confinement they were obligated to provide for female prisoners at Huron Valley were to be provided to all female prisoners wherever they were housed. The district court explained, for example, that the state had the same obligation to its female prisoners in county jails as it had to female prisoners in state-operated institutions.

### 2.

■ Defendants contend that the 1981 order replaced the 1979 order and, therefore, any finding of contempt must be based entirely on the 1981 final order. We agree.

The 1979 district court order set forth in general terms the remedies defendants were required to implement and directed the defendants to submit, for court approval, their plan detailing the steps to be taken to comply with the 1979 order. Defendants timely submitted their plan and conferences were held to work out an acceptable program of compliance.

The 1981 final order was the culmination of party negotiations. It was arrived at by agreement of counsel and was approved by the court. The intent of the 1981 order was to spell out the remedies required. Thus, the 1981 order replaced the 1979 order and the 1981 final order must form the basis of any contempt finding.

### 3.

Defendants contend that the district court's contempt finding went beyond the

terms of the 1981 final order and that plaintiffs have failed to present clear and convincing evidence demonstrating defendants violated the 1981 order.

The district court found defendants in contempt for violating the court's requirements relating to the six subject areas addressed in the prior orders. We shall review each area separately to determine whether the district court abused its discretion in finding contempt. *Cincinnati Bronze*, 829 F.2d at 590.

### (a) ACCESS TO COURTS

■ In its 1981 final order, the court explained that the objective of the paralegal training program it required was to provide a pool of adequately trained female inmates who could provide legal assistance to fellow inmates. The court ordered that the training program be continued until that objective was accomplished. The court's 1985 contempt order modified the 1981 order by requiring that inmate paralegal trainees be paid wages of $1.50 per day.

Neither the paralegal training order nor the wage rate order was obeyed. The court found, with ample support in the record, that as of July 1986, inmate trainees at Huron Valley were being paid 25 cents per day and in 1989 the trainees were only paid $1.50 per class. Moreover, the training was inadequate. There were no introductory paralegal programs offered at Huron Valley between March 1983 and March 1986. One advanced paralegal course was taught for a short time in 1983 but the course was never completed. No paralegal programs were offered at Crane and its law library did not contain the required materials until January 1986, eight months after it opened. The court found that the Crane library was brought into compliance with the court's minimum requirements only because the threat of a contempt hearing forced defendants to act.

Defendants argued that ten prisoners had received some legal training at Huron Valley. The court found that only two female prisoners were acting as legal aides at the time of the hearing and that neither of them was residing at Huron Valley. Defendants argued that there were eleven female inmate paralegals at Crane. The court identified four, two of whom could not participate in suits against the Department by virtue of their employment with Prison Legal Services. The court found that there was not an adequate pool of trained legal assistants either at Huron Valley or at Crane and ordered paralegal education to be continued at Huron Valley and begun at Crane. The court concluded from all of the foregoing that defendants had disobeyed its orders requiring court access.

We are satisfied that the court's findings are supported by clear and convincing evidence and, therefore, the contempt order as to access to courts was not an abuse of discretion.

### (b) EDUCATIONAL PROGRAMMING

#### (1.) Associate Degree

■ The court's 1981 order required defendants to continue parity of community college opportunities and to offer "a systematic and coherent course package which, when successfully completed, culminates in the receipt of an Associate's Degree." 510 F.Supp. at 1021. The court found that a systematic and coherent associate degree course plan was not in effect for female inmates. The same courses were repeated and the course offerings did not lead to a degree. The court's findings are supported by clear and convincing evidence, and the finding of contempt as to associate degree programming was not an abuse of discretion.

#### (2.) Baccalaureate Degree

The district court's 1981 order imposed no specific obligation upon the defendants to provide a four-year baccalaureate program at Huron Valley. Instead, the court ordered defendants to:

assist and cooperate in the establishment and operation ... of a baccalaureate program which any four-year college desires to offer women inmates; and *in no way shall that assistance be less than that*

*provided to colleges providing baccalaureate programs at mens' prisons.*
*Id.* (emphasis added).

It is the emphasized second portion of its order that the court has found the defendants violated. The court determined that contrary to its order that "in no way" shall defendants' assistance and cooperation in establishing and operating a baccalaureate program any four-year college wishes to offer to women inmates "be less than that provided to colleges providing baccalaureate programs at mens' prisons," considerably less "assistance and cooperation" was provided and, in fact, until 1986, virtually none at all. *Id.*

The district court found that since 1981, Spring Arbor College has provided a four-year baccalaureate program for male inmates and has awarded at least forty baccalaureate degrees. On the other hand:

> The Department admits that no four-year degree programming was offered at [Huron Valley] in 1979, 1980, 1981, 1982, 1984, in the fall of 1985 or the spring of 1986. ... Eastern Michigan University, ... which provided programming in 1983 and in the spring of 1985, was not adequately paid for its services. As a result EMU declined to provide further services to the Department.

721 F.Supp. at 817–18.

The court also found that it was not until 1986, following contempt hearings, that "the Department arranged for Spring Arbor to provide baccalaureate programming at [Huron Valley]" but that "[t]here are still no three- and four-year courses at Crane or Crane Annex." *Id.* at 818, 835. The district court also found that defendants' support of the baccalaureate program for men was so substantial that beginning in 1984, the Legislature included a line item in the Department of Education budget to fund the baccalaureate program for men at the State Prison of Southern Michigan.

■ Defendants' response to the court's conclusion that they have failed to comply with the terms of the 1981 order concerning the provision of support and assistance for baccalaureate programs for female inmates is the rather disingenuous argument that neither Spring Arbor College nor any other institution has found it to be financially attractive to offer a baccalaureate program for female inmates either at Huron Valley or at Crane and, therefore, there is no baccalaureate program for female inmates to be supported and assisted. Defendants also argue that it is the Legislature, not the Department of Corrections and the individual defendants, which appropriated the funds for the line item budget support for the baccalaureate program for men at the State Prison of Southern Michigan.

The reality, of course, is that provider institutions were unwilling to provide baccalaureate programming for female prisoners at the locations and in the circumstances in which female prisoners were confined for several years following the 1981 order. The record is entirely devoid of any evidence that defendants proposed any program or took any affirmative action whatever to make it financially attractive to provider institutions to establish a four-year program for female inmates in the Michigan correctional system. The defendants are providing lights, heat, classroom space, manpower, and allied educational support to the baccalaureate program for men and, save for the aborted Eastern Michigan University experience, at least until 1986, provided nothing whatever to support a baccalaureate program for female inmates. It was defendants' duty to exhaust all reasonable efforts to design a program for offering baccalaureate studies to female inmates at times, in places, and under circumstances which were likely to attract the interest of one or more of Michigan's many degree-granting institutions.

Moreover, it is no answer to argue that it was the Legislature and not the defendants who provided the line item appropriation to fund the baccalaureate program for men. The funding was provided with the encouragement, assistance, and cooperation of defendants, in order to induce Spring Arbor College to continue to offer a baccalaureate program for men. There is no evidence that defendants undertook any effort what-

soever, prior to 1986, to secure comparable funding for a baccalaureate program for female inmates. It is relevant, of course, that it was five years after the court's order here in question, and only after contempt hearings were conducted, that defendants arranged for Spring Arbor College to offer a baccalaureate program at Huron Valley.

The assistance and support, both direct and indirect, defendants have provided for the baccalaureate programs being offered male inmates is ongoing and substantial. Until 1986, with the exception of two short periods of less than one year, defendants provided no comparable assistance to support any baccalaureate degree program for female inmates.

We conclude that there is very substantial evidence in the record to support the court's conclusion that defendants knowingly violated the court's 1981 order concerning baccalaureate degrees, and we find no abuse of discretion in the court's judgment that defendants are in contempt for disobedience of the order.

### (c) VOCATIONAL PROGRAMMING

■ The district court found defendants in contempt for failing to provide adequate vocational programming for female inmates. However, remedies for the unequal vocational programming available to female inmates were omitted from the 1981 order because they were being developed and would be incorporated in a supplemental final order. No supplemental order was ever filed; therefore, defendants may not be found in contempt for violating the court's 1981 order regarding vocational programming. The court's finding of contempt on this ground was, therefore, an abuse of discretion.

### (d) APPRENTICESHIP OPPORTUNITIES

In 1981, the court ordered the establishment of five apprenticeship programs for female inmates. As of April 1987, only three apprenticeships were offered at Huron Valley and neither the painting nor carpentry apprenticeships complied with the required hours of academic instruction. There were no apprenticeship programs at all at Crane. The dental assistant apprenticeship training was discontinued purportedly due to prison policy violations, but, as the court noted, defendants did not raise these policy objections as an issue until plaintiffs' contempt motion was brought. Instead, defendants discontinued the program without seeking a modification of the court's order.

After April 1987, only two apprenticeships remained, painting and building maintenance, and neither were given adequate academic instruction. *Id.* at 839, 842.

Therefore, defendants violated the court's 1981 order regarding apprenticeship programming, and the court did not abuse its discretion by finding defendants in contempt.

### (e) PRISON INDUSTRY, TRUST FUND PAYMENTS, AND PRISONER WAGES

■ The court has found defendants in contempt for disobeying its order concerning the wage scale for female inmates. In 1981, the court ordered that two prison industries, license plate tabs and chair cushion manufacturing, be established at Huron Valley by January 1982, and that a trust fund be created to pay back wages to female inmates from January 1980 until the industry program became operational. The court also *recommended* that defendants review the wage scale paid prisoners to insure female and male inmates are paid equally for comparable work.

We can find no basis for holding defendants in contempt with regard to prison industry programs or trust fund payments. Three prison industry programs for female inmates are in operation: two at Huron Valley, chair cushions and license plate tabs; and one at Crane, data processing. The trust fund problem was also resolved. However, wage disparity remains because wage classifications are based on skill level and female inmates are provided a lower quality of training and have fewer skills than male counterparts.

In its 1981 order, the court required that the prison wage standard be reviewed "to ensure that departmental wage policy is applied fairly to women inmates whose job functions are comparable to those performed by male prisoners at similarly-sized institutions." 510 F.Supp. at 1022–23. The court addressed the matter of wages in its 1989 opinion and found that female inmates were still being paid less than men because they "are exposed to lower quality training and as a consequence have fewer skills and are eligible for lower wages." 721 F.Supp. at 840. The court concluded:

I have seen no evidence that the quality of programming has improved sufficiently to justify the inference that women now have the opportunity to earn equal wages for comparable work.

*Id.* The court found defendants in contempt.

There is no evidence suggesting that female inmates have job functions comparable to male inmates at similarly-sized institutions or that the departmental wage policy is being applied unfairly. Perhaps the existing wage disparity problem will be corrected once the violations of the court's order regarding apprenticeships are remedied and vocational programming is developed. We think, however, that the court was not justified in finding defendants in contempt for wage disparity and that, in doing so, the court abused its discretion.

### (f) OFF–GROUNDS PRIVILEGES AND WORK PASS PROGRAMS

■ The court's 1981 order required that off-grounds programming be provided under certain circumstances. No such programs were established. The 1981 order excluded work pass programming, indicating that such programming would be included in a supplemental order. The supplemental order was never filed. Thus, no finding of contempt may be based on the failure to provide a work pass program.

The court did not abuse its discretion, therefore, in holding defendants in contempt for violating its order regarding off-grounds programming, but the court could not hold defendants in contempt for failing

to institute a work pass program since the final order failed to mention such a requirement. We note that Crane Annex had a work pass program.

### D.

■ Defendants contend that enforcement of the district court's order requires the participation of nonparties, namely state agencies and the Legislature, and, therefore, that the court-ordered reform should be abandoned as not susceptible to judicial resolution. Defendants contend that the court's order also requires the state to appropriate money to fund baccalaureate programs for female inmates despite the fact that the state is not a party. We disagree.

The district court's orders are directed at defendants and no others. The court ordered defendants to provide parity of programming for male and female inmates. The court has not directed the state to fund baccalaureate programs for female inmates. Instead, it held that the assistance given to colleges interested in providing four-year baccalaureate programming to female inmates must be comparable to the assistance given colleges interested in providing similar programming to male inmates. In any case, in 1989 the state legislature included in its appropriations for fiscal year ending September 1990, funding "for ... implementation of the consent decree requirements [o]f *Glover v. Johnson* ...." 1989 Mich.Legis.Serv. 183, § 1005 (West).

### E.

■ The district court directed defendants to select a qualified special administrator to develop a plan to remedy the constitutional violations, and announced it would appoint a monitor to periodically report on the administrator's progress.

Defendants contend that by requiring defendants to select a special administrator to be approved by the court, the court has, in effect, ordered the appointment of a judicial administrator, an excessively intrusive remedy. Defendants claim there has been

no showing that the court cannot enforce its orders itself. Further, defendants question how the court expects a special administrator, appointed by defendants, to develop a plan to achieve parity when the court admitted it could not devise such a plan.

The district court's earlier attempt to appoint a judicial administrator was vacated by this court. We set forth the standard:

> [T]he district court may, in the exercise of its equitable powers, take such means as are necessary to enforce its judgment finding a violation by a state agency and its officials of the constitutional rights of inmates of a state correctional institution. And while considerations of federalism and comity caution restraint in the intrusion of federal judicial authority into the administration of state correctional institutions, exercise of that authority may include appointment of a court supervised administrator to oversee such aspects of prison policy as have, in the past, resulted in unconstitutional practices.

> However, before a district court undertakes to override the prerogatives of state correctional authorities in the administration of any aspect of prison administration, it must assure itself that no less intrusive means of bringing about compliance with constitutional requisites is available.

855 F.2d at 285–86 (citations omitted). In rejecting the district court's prior effort to appoint a judicial administrator, we stated:

> [T]here is no record showing in this case that the court cannot enforce its orders itself, perhaps with the assistance of a monitor, but without the intrusive interference of a judicial administrator.

> We think that *on the basis of the record before us*, the district court has not been presented with an evidentiary record that justifies that extraordinary remedy and has, therefore, abused its discretion in appointing the administrator.

*Id.* at 287 (emphasis added).

We are satisfied that the district court has now been presented with sufficient evidence to justify the appointment of an administrator to develop a plan to bring defendants into compliance with the court's order.

> In the fact [sic] of present noncompliance, and the Department's demonstrated unwillingness and inability to provide a remedy on its own, I must resort again to expert assistance.

> . . . .

> The remedy outlined above is not overly intrusive. The Department has had ample opportunity during the last ten years to bring about parity in educational and vocational opportunities for women inmates. ... There is no reason to assume, as there was in *Kendrick v. Bland*, 740 F.2d 432 (6th Cir.1984), that the Department will act to alleviate the unconstitutional conditions on its own. In fact, it is abundantly clear that no improvement will occur unless this court intervenes. An effective remedy must intrude to a degree on the Department's prerogatives; the remedy supplied here is fully justified in light of the "long and unhappy history" of this litigation. *Hutto [v. Finney*, 437 U.S. 678, 687, 98 S.Ct. 2565, 2572, 57 L.Ed.2d 522 (1978) ].

> The remedy is also the least intrusive effective remedy.

> . . . .

> It is the Commission, not I, that will appoint the Special Administrator. The Special Administrator will work under its direction and guidance. Thus, it will be the Commission, not the court, that proposes a remedial plan. The Monitor appointed by me will have access to all necessary information, but will have no authority to require the Commission or the Department to act.

721 F.Supp. at 849–51.

The district court did not abuse its discretion in requiring defendants to appoint an administrator to develop the remedial plan. The court determined it needed expert advice to develop and coordinate a program whereby the needs of the Department of Corrections, the female prisoners, and the educational community could be served. The court declined to outline the specific

steps required to achieve parity because its 1981 effort to do so was unsuccessful. Rather, the court believed that defendants' efforts at compliance would improve if defendants were involved in creating the plan.

The dissent argues that the appointment of a special administrator, even one appointed by the defendants, is "an excessively intrusive remedy." We respectfully disagree. We respectfully disagree, too, with the dissent's view that the defendants' failure to comply with the district court's orders is attributable, in any significant measure, to legitimate dispute as to what was required, or lack of specificity of the consent order.

The history of this case shows a consistent and persistent pattern of obfuscation, hyper-technical objections, delay, and litigation by exhaustion on the part of the defendants to avoid compliance with the letter and the spirit of the district court's orders. The plaintiff class has struggled for eleven years to achieve the simple objectives of equal protection under the law generally, and equality of opportunity specifically. In our judgment, the appointment of a special administrator by the defendants is, in the second decade of this litigation, a valid and reasonable means to ensure the dual goals of prompt, meaningful, and full compliance with the district court's orders and the early extrication of the federal judiciary from the management of state governmental functions. Although this court previously held that the district court's appointment of an administrator was inconsistent with this second goal, we now believe, given the district court's recent fact-finding, that an administrator appointed by the defendants, whose work can be monitored by the district court with a view toward early termination of judicial supervision, is not excessively intrusive.

The district court did not abuse its discretion in requiring defendants to appoint an administrator to develop a remedial plan.

### III.

On November 27, 1989, the district court awarded plaintiffs' counsel attorneys' fees and costs for work done from February 1 to December 31, 1987, and from January 1 to June 30, 1989. The 1987 fees involved the appellate work which resulted in this court's decision in *Glover*, 855 F.2d at 277. The 1989 fees were for work done in connection with the contempt hearing which led to the decision now on appeal, *Glover*, 721 F.Supp. at 808.

### A.

■ Defendants claim the district court erred in awarding attorneys' fees without determining whether plaintiffs were prevailing parties. They contend that plaintiffs are not prevailing parties under 42 U.S.C. § 1988 until this court reviews the district court's finding of contempt because compliance with the court's 1979 and 1981 orders is the sole issue, and plaintiffs cannot establish the degree of success required to be a prevailing party entitled to a fee award until this court decides the contempt issue.

Defendants also argue that plaintiffs may not collect those fees as monitoring fees under 42 U.S.C. § 1988 because plaintiffs' contempt motion was a new proceeding and not an effort to monitor the court's previous orders. Defendants contend that the November 12, 1985 court order awarding plaintiffs post-judgment attorneys' fees was an order directed at plaintiffs' role as monitor, not litigator, and, therefore, is not controlling.

Plaintiffs respond that the November 1985 order for attorneys' fees has been relied on by the parties for four years and is the law of the case as it relates to plaintiffs' entitlement to post-judgment attorneys' fees.

Even if the November 1985 order relates only to monitoring the enforcement of the 1979 and 1981 judgment, the filing of a motion for contempt for noncompliance is a post-judgment monitoring activity and compensable. Moreover, plaintiffs may rely on the trial court's 1985 order to establish that they are prevailing parties and, pursuant to that order, plaintiffs have succeeded on a significant issue.

The district court found that its November 1985 order granting plaintiffs' post-judgment attorneys' fees was controlling and dismissed defendants' prevailing party contention as untimely raised. The court noted that the parties stipulated to the November 1985 order and that defendants should have raised a section 1988 prevailing party exception at that time.

The November 12, 1985 order provides:

Plaintiffs are entitled to attorney fees and [ ] requests for such fees shall be submitted to opposing counsel every six months. Defendants will have twenty-eight days in which to contest the amount of the fee request.

The parties agree that this order allows plaintiffs to receive post-judgment attorneys' fees in this case.

The district court has the discretion to award the prevailing party in a civil rights action reasonable attorneys' fees. 42 U.S.C. § 1988. We reject the argument that the filing of a contempt motion to compel compliance with the court's previous orders is something other than monitoring, which is a compensable activity under section 1988. *Northcross v. Board of Educ. of Memphis City Schools*, 611 F.2d 624, 637 (6th Cir.1979), *cert. denied*, 447 U.S. 911, 100 S.Ct. 2999, 3000, 64 L.Ed.2d 862 (1980). Even the cases defendants cite suggest that a motion for contempt and contempt proceedings are compensable monitoring activities. *See Keith v. Volpe*, 833 F.2d 850, 857 (9th Cir.1987); *Garrity v. Sununu*, 752 F.2d 727, 738 (1st Cir.1984). *See also, Stenson v. Blum*, 512 F.Supp. 680, 684 (S.D.N.Y.), *aff'd*, 671 F.2d 493 (2d Cir.1981), *aff'd in part, rev'd in part on other grounds*, 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984).

In bringing the contempt motion, plaintiffs were seeking defendants' compliance with the district court's 1979 and 1981 orders in which plaintiffs were prevailing parties. The district court did not abuse its discretion in finding plaintiffs were entitled to attorneys' fees.

**B.**

Defendants contend that plaintiffs failed to prove by a preponderance of the evidence that $135 per hour was the prevailing market attorney fee rate in the community because the third-party affidavits plaintiffs submitted did not establish the prevailing market rate and defendants' opposing affidavits demonstrated that the prevailing rate was lower than $135 per hour. Defendants also argue that the district court's fee award compensated plaintiffs' counsel for duplicative efforts, excessive time, multiple appearances at hearings, and counsels' lobbying efforts to change the Department of Corrections' appropriations bill.

Plaintiffs contend that the trial court did not abuse its discretion in determining the number of hours and hourly rate used to calculate the award of attorneys' fees.

The district court awarded a $135 hourly rate rather than the $92 median hourly rate requested by defendants because the court found that counsels' qualifications, experience, and skill in prisoners' rights litigation merit the greater hourly rate. Moreover, the third-party affidavits submitted by plaintiffs established the prevailing market rate. Finally, the court relied on the fee awards set in another large scale prisoners' rights case, *Knop v. Johnson*, 712 F.Supp. 571 (W.D.Mich.1989), to establish the prevailing market rate of $135 per hour.

In *Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984), the Court held that reasonable fees under section 1988 are calculated according to the prevailing market rate in the relevant community. The market rate can be established by proving that the rates sought are rates charged for similar services by lawyers of comparable skill, experience, and reputation. *Id.* at 895 n. 11, 104 S.Ct. at 1547 n. 11. We think the district court properly calculated the prevailing market rate.

The district court also found that plaintiffs' counsel did not spend excessive time, duplicate efforts, work on unrelated matters, or spend an inordinate amount of time conferring with each other or reviewing each others' work. The court reasoned:

[Counsels'] affidavits show that they generally worked on separate tasks; each made a separate contribution. The hours they spent conferring are reasonably proportionate to their total hours. Given the magnitude and the complexity of this case, such consultation is at least reasonable, and probably necessary.

The court rejected the notion that the 19.8 hours expended in lobbying efforts were unrelated to this case, finding instead that the appropriations were at the heart of the dispute since defendants blamed their noncompliance on lack of funding. At oral argument, plaintiffs' counsel informed this court that counsels' appearance before the state legislative committee was at the committee's request as the committee was reviewing its obligations under the *Glover* judgment.

The court did not abuse its discretion in determining the amount of the fee award. *Hensley v. Eckerhart,* 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983).

### IV.

In summary, we conclude that the district court abused its discretion in finding defendants in contempt with regard to work pass and vocational programming since those programs were omitted from the court's final order in 1981. The court also abused its discretion in finding contempt based on the claimed wage disparity.

The district court did not abuse its discretion, however, in finding defendants in civil contempt for their disobedience of the court's orders in the other particulars discussed herein, or in requiring defendants to appoint a special administrator. There was no abuse of discretion in the award of attorneys' fees.

AFFIRMED in part and REVERSED in part.

KENNEDY, Circuit Judge, concurring in part and dissenting in part.

I concur in all of the majority opinion except for part II.E. By requiring defendants to select a special administrator, the Court has in effect ordered the appointment of a judicial administrator, an excessively intrusive remedy. I am not persuaded that "no less intrusive means of bringing about compliance with constitutional requisites is available." *Glover v. Johnson,* 855 F.2d 277, 286 (6th Cir.1988).

"[T]he federal equity court in fashioning a remedy must afford relief which is 'no broader than necessary to remedy the constitutional violation.'" *Kendrick v. Bland,* 740 F.2d 432, 437 (6th Cir.1984) (quoting *Newman v. State of Alabama,* 683 F.2d 1312, 1319 (11th Cir.1982)). "These underlying and restrictive principles of comity and federalism are perhaps nowhere more compelling than in actions seeking relief against unconstitutional practices, policies and conduct manifest in state penal institutions." *Id.*

I recognize that defendants failed in many respects to comply with the 1981 consent order. However, in a number of those respects they were disputing what was required. For example, a number of the areas in which defendants were found to be in contempt related to Crane, where defendants were insisting the consent decree was inapplicable, and this Court had not yet affirmed the District Court's ruling that the consent decree applied to the Crane facility. Also, a number of the deficiencies in compliance with the educational component of the 1981 consent order arose out of defendants' interpretation of that order that they need only spend an equal amount per inmate in men's and women's programs, and were not responsible for providing associate degree programs if local community colleges were unwilling to conduct them under the funding available.

The lack of specificity in the consent order contributed to the defendants' failure to comply. That lack of specificity is demonstrated by the first task assigned to the proposed administrator, that is, "to prepare a plan to remedy the constitutional violations." Presumably the plan referred to is a plan to carry out the terms of the consent order as construed by the District Court and to the extent affirmed by this Court. In our previous opinion, we suggested that a detailed plan be developed for remedying

any equal protection violation by offering female inmates an educational program based upon parity of expenditures rather than the same degrees, courses and subjects for men and women. *Glover,* 855 F.2d at 288. The development of that plan will require a workable definition of parity. It does not seem to me that a court-mandated administrator should devise that plan. Rather, it should come from the parties or the court, and any administrator should be limited to enforcing it.

Once a plan is prepared and accepted by the court, a requirement of periodic reports and a court-appointed monitor should be sufficient to secure compliance. I do not see this as a case where defendants defied the District Court order. Rather it is a case of disagreement as to what was required and of poor management. Therefore, a less intrusive means of assuring compliance is called for.

EDWARDS, Senior Circuit Judge, concurring in part and dissenting in part.

I concur in the findings of the majority, but dissent from the isolated ruling that the court abused its discretion under parts II(C)(3)(c) and II(C)(3)(e). These sections of the opinion concern the "failure of the Department to provide the vocational programming" and to correct "wage disparity between female and male inmates." *See, Glover v. Johnson,* 721 F.Supp. 808, 842 (E.D.Mich.1989) (*Glover III*). It seems abundantly clear that the Department knew its duty in its entirety and deliberately chose to make no attempt to comply or even question the court about any ambiguity it may have perceived. *See, Peppers v. Barry,* 873 F.2d 967, 968 (6th Cir.1989) (Requiring all reasonable attempts to comply with an order to preclude a finding of contempt). After a ten year struggle with the Department to correct their unconstitutional disparate treatment of women inmates, I can see no abuse of discretion in the finding of contempt on all issues.

Respectfully, I must disagree with majority's assertion that Judge Feikens abused his discretion finding the Department in contempt for violating his order to improve the vocational programs available to the women inmates of Michigan prisons. The court clearly mandated in its 1979 order "that a vocational counseling and testing program" be initiated and "a survey be taken to determine (the inmates) interests, needs, and abilities." *Glover v. Johnson,* 478 F.Supp. 1075, 1103 (E.D.Mich.1979) (*Glover I*). The order, thereby, directed the Department of Corrections to administer the program and survey. Moreover, the Department was ordered to "implement those vocational programs receiving significant support from the inmates." *Id.* Yet, after a year of inaction, the court itself had to order the appointment of a "Vocational Program Coordinator" to counsel and poll the inmates to determine desirable and effective training programs. *Glover III,* 721 F.Supp. 808, 820 (E.D.Mich.1989). The coordinator's report, Project Grow, recommended several programs, but, none were ever implemented. *Id.* In short, the defendants knew the intent of the prior order and for more than ten years refused to fully comply with the order.

As a direct consequence of these "willful and intentional violations" of the court's order to improve the educational and job training opportunities, the prison wages of female inmates are still far below their male counterparts. *Glover III,* 721 F.Supp. 808, 842 (E.D.Mich.1989). The court specifically noted that the failure to improve the overall rehabilitative opportunities for the women has continued the disparity. *Id.* at 826. As only one example, the women's facilities have lower grade, non-commercial food preparation equipment more akin to a home economics course than a job training or rehabilitative program. *Id.* at 821 and n. 9. It, thereby, seems perfectly justified, and, indeed consistent to hold the defendants in contempt on the issue of wage disparity as a consequence of their violative acts.

Accordingly, I would affirm the court's findings in their entirety. In its ten year tenure over this dispute, the court below at all times attempted the least intrusive means to focus the Department's attention on their explicit constitutional violations and steer them away from their "studied

indifference." *Glover III, supra.* at 811. The court initially maintained the necessary restraint to allow the Department to correct the situation. *See, Hutto v. Finney,* 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978). After a decade of concerted *inaction* and no progress, the end result was a "series of disappointments and frustrations" for the court. *Glover III, supra* at 813. The goal in maintaining jurisdiction over this case was to rectify the entire constitutional violation of the equal protection of law encompassing disparate educational, vocational, and rehabilitative opportunities for the women inmates. Considering the lack of affirmative action on the part of the Department, the finding of contempt on all the issues was well justified and should be affirmed.