Eugene R. GRACE, Plaintiff–Appellee,

v.

**CENTER FOR AUTO SAFETY,**
Defendant,

**Clarence M. Ditlow (94–1844/1933),**
Defendant–Appellant,

**Mark Robinson (94–1764/1890),**
Attorney–Appellant,

**General Motors Corporation,**
Movant–Appellee.

Nos. 94–1764, 94–1844, 94–1890 and 94–1933.

United States Court of Appeals, Sixth Circuit.

Argued Dec. 4, 1995.

Decided Jan. 9, 1996.

Daniel L. Gardner (argued and briefed), Los Angeles, CA, for Eugene R. Grace.

Mark R. Bendure (argued and briefed) and James C. Howarth, Detroit, MI, for Mark P. Robinson.

Joseph E. Papelian (argued and briefed) and Michael P. Milliken (briefed), General Motors Corp., Office of General Counsel, Detroit, MI, for General Motors Corp.

Robert S. Harrison, Skadden, Arps, Slate, Meagher & Flom, New York City, for Center for Auto Safety.

Paul A. Levy (argued and briefed), Public Citizen Litigation Group, Washington, DC, for Clarence M. Ditlow.

Before: BROWN, NELSON, and MOORE, Circuit Judges.

DAVID A. NELSON, Circuit Judge.

This is an appeal from orders imposing sanctions against defendant Clarence M. Ditlow and one of his lawyers, Mark Robinson, for an alleged violation of a protective order and for delaying a hearing thereon.

The protective order, which had been issued in connection with discovery proceedings in a defamation action against Ditlow and his employer, prohibited disclosure of a certain deposition transcript to anyone outside a class of persons that included "the parties and their attorneys." Ditlow allowed a lawyer named Butler to receive a copy of the transcript. Although Butler was not one of the counsel of record in the defamation case, he had been providing unpaid legal assistance to the defendants. On the strength of this fact, Ditlow contends that Butler was not clearly shown to have been outside the class of persons to whom disclosure was permitted under the terms of the protective order.

We agree. The protective order did not clearly and unambiguously prohibit Ditlow from giving the deposition to Butler, in our view, and the district court's finding to the contrary was incorrect in its legal aspect and clearly erroneous in its factual aspect. Because we conclude that the imposition of sanctions represented an abuse of discretion, and because there was no finding that the hearing was delayed through bad faith, we shall reverse both of the challenged orders.

I

Defendant Ditlow is the executive director of the Center for Auto Safety, a consumer advocacy organization based in Washington, D.C. The Center, which was founded by Ralph Nader and the Consumers Union, assists plaintiffs' personal injury lawyers in lawsuits related to automotive safety. Mr. Ditlow and the Center apparently maintain a relationship with the litigation group of Public Citizen, Inc., an organization that has been described as "Nader's longtime flagship lobbying, litigation group." See P. Brimelow and L. Spencer, *Ralph Nader, Inc.,* Forbes, Sept. 17, 1990, at 117, 120. Mr. Ditlow is represented in this appeal by Public Citizen Litigation Group lawyers.

In February of 1993 a state court jury in Georgia returned a verdict of more than $105 million against General Motors Corporation in a wrongful death case involving the design of a GM pickup truck equipped with a "side saddle" fuel tank. (The judgment entered on this verdict was subsequently reversed on appeal. *General Motors Corp. v. Moseley,* 213 Ga.App. 875, 447 S.E.2d 302 (1994).) The plaintiffs in the Georgia case, Thomas and Elaine Moseley, were represented by attorney James E. Butler, Jr., whose firm maintains offices in Columbus and Atlanta, Georgia.

About two weeks after the verdict in the Moseley case, Mr. Butler, Mrs. Moseley and some of the jurors reportedly appeared at a press conference called by Mr. Ditlow and the Center for Auto Safety. See A. Frankel, *Debunking the GM Conspiracy Theory,* American Lawyer, Nov. 1995, at 86. At the conference Mr. Ditlow distributed a press release accusing General Motors of engaging in the destruction of documents and suppression of evidence relating to the fuel systems of GM pickup trucks. The press release asserted that a Los Angeles lawyer named Eugene Grace had directed a task force engaged in locating incriminating documents in GM's engineering files so that the documents might be destroyed.

Mr. Grace promptly brought a defamation action against the Center and Mr. Ditlow in federal court in Los Angeles. Ditlow was quoted in the press as welcoming the suit,

"saying it would give his group an opportunity to see GM's internal documents on the safety issue." *Newsday,* Nassau ed., Mar. 4, 1993, at 45.

The Center's insurance carrier provided a defense in the defamation action and ultimately settled the case by paying Mr. Grace the full policy limit of $500,000.00. (The Center allegedly objected to the settlement, but was overruled by the insurance company.)

The settlement did not occur until May of 1994. In the meantime the insurance company arranged to have a member of a California law firm enter an appearance in the defamation action as counsel for the defendants. The defendants wished to be represented by counsel of their own choosing as well, and they engaged Mark Robinson, a former California Superior Court Judge, to act for them. Joining Mr. Robinson as counsel of record for the defendants were Lesley Brueckner and Brian Wolfman of the Public Citizen Litigation Group.

The Center and Mr. Ditlow did not rely solely upon counsel of record. Mr. Ditlow showed the *Grace* complaint to a Washington lawyer named Reuben B. Robertson, III, a longtime informal legal advisor to the Center, and consulted with him about the case on numerous occasions during the first six months or so in which the action was pending. These consultations, according to an affidavit signed by Mr. Robertson in support of a motion for reconsideration of the challenged orders, dealt with the composition of the defense team, litigation strategy, and discovery matters, among other things. Mr. Ditlow also consulted with unnamed attorneys from the Public Citizen Litigation Group.

In addition, the Center hired a young staff attorney, Alpa Patel, to work on the *Grace* case. Her responsibilities, she stated in an affidavit signed in February of 1994, included drafting discovery papers, analyzing depositions taken in *Grace* and comparing them to depositions taken in other cases, preparing memoranda on the issues in *Grace,* and obtaining and analyzing documents thought to be helpful to the defense.

From the beginning of her employment by the Center in April of 1993 until the time when her affidavit was signed in 1994, Ms. Patel attested, she obtained assistance in these matters from the Georgia law firm of Butler, Wooten, Overley & Cheeley. The "Butler" in that firm is the same James E. Butler, Jr., who accompanied Mr. Ditlow at the press conference out of which the defamation case arose.

In August of 1993, Reuben Robertson's affidavit says, Mr. Butler was sounded out on his willingness to replace Mark Robinson as lead defense counsel in *Grace.* "Mr. Butler responded that he did not believe that he would be the most appropriate person to serve as trial counsel," the affidavit continues, but Butler "confirmed that he had been and was willing to continue advising the Center and Mr. Ditlow on litigation strategy, procedure, discovery and other matters relating to the *Grace* litigation."

Prior to Mark Robinson's appearance in *Grace,* according to an affidavit signed by Mr. Ditlow in January of 1994, the Center and Ditlow relied on the Butler firm as their "primary" counsel. "We still rely on their assistance and counsel in this case," the affidavit asserts. It is undisputed, however, that neither Mr. Butler nor his firm ever appeared as counsel of record in *Grace.*

Ms. Patel's affidavit contains the following account of the assistance she received from Butler's firm:

"The Butler, Wooten firm provided legal counsel and assistance to me in the following matters in defense of Grace v. CAS.

A. Drafting interrogatories and requests for production of documents;

B. Drafting legal memoranda and providing relevant cases to be used in opposition to various motions filed by Plaintiff in Federal District Court in Los Angeles;

C. Reviewing depositions and suggesting lines of questions for depositions that would be helpful to the defense in Grace v. CAS;

D. Providing documents to me that the Center could use to support our case; and

E. Suggesting witnesses and discussing what they would be likely to testify to in support of the defense of Grace v. CAS."

Ms. Patel went on to say in her affidavit that she had been receiving such assistance from the Butler firm on at least a weekly basis over the entire period of time—about ten months by then—that she had been working on *Grace*. The record contains nothing to contradict any of Ms. Patel's representations.

Although Mark Robinson was counsel of record for the defendants in *Grace*, he testified that he did not know it was Mr. Butler from whom Mr. Ditlow and the Center were receiving assistance of the sort described by Ms. Patel. Mr. Robinson testified that he was aware Mr. Ditlow "had consulting attorneys back there," but Robinson thought they were public interest lawyers rather than personal injury lawyers. "I did not realize it was Mr. Butler," Mr. Robinson told the federal district court in Detroit at a hearing on the imposition of sanctions. The district court made no express finding that Mr. Robinson's testimony—which was given under oath and subject to cross-examination—was false. We have no reason at all to believe that Mr. Robinson was being untruthful.

The contretemps that resulted in the imposition of sanctions occurred, we are satisfied, precisely because Mr. Robinson did *not* realize that Mr. Butler was one of Mr. Ditlow's "consulting attorneys" in the *Grace* case. Here is what happened.

The defendants in the defamation case had pleaded as an affirmative defense that the statements made by Mr. Ditlow and the Center about document destruction were true. In an attempt to substantiate this defense, the defendants sought discovery of documents from GM in Detroit. The defendants also caused a number of GM employees to be subpoenaed for depositions.

On October 20, 1993, GM filed a motion in the federal district court in Detroit seeking to quash a third-party subpoena received by the company. In addition, GM asked for a protective order designed, among other things, to preclude the defendants from using subpoenas to obtain GM documents or testimony not directly related to the allegation of document destruction. The motion in ques-

tion did not ask for the sealing of any deposition transcripts.

A hearing on the motion was held before Judge Hackett on October 25, 1993, after two depositions scheduled for that day had been aborted. Mark Robinson, who had been planning to take the depositions, represented the defendants at the hearing. In the course of a discussion with the court about discovery logistics, Mr. Robinson suggested that while he was taking depositions later in the week it would be helpful if Mr. Ditlow and "house counsel in Washington" could examine documents that GM had undertaken to make available for inspection. Counsel for GM interjected that Mr. Robinson had spoken earlier about having the documents reviewed by lawyers who represented plaintiffs in product liability cases against GM. The court responded that examination of documents by such lawyers would not be appropriate:

> "Not appropriate, not appropriate counsel. This discovery's limited to this lawsuit. It's the defamation claim in the California Court. It's the purpose of the subpoena. It's limited to that, not a general fishing expedition for all kind of product liability cases that might be brought by someone at sometime or pending elsewhere."

At the conclusion of the October 25 hearing Mr. Robinson confirmed that he had suggested to GM's counsel that "[i]f you want to speed things up, I can get some plaintiffs' attorneys that really know these records to go through [them]." The GM lawyer had said that he didn't want that, Mr. Robinson continued, to which Mr. Robinson had replied "fine." There was no discussion at the October 25 hearing about sealing any deposition transcripts, and the order ultimately entered by Judge Hackett on GM's motion did not address that issue.

On October 28, 1993, Mr. Robinson began taking the deposition of Maynard Timm, an attorney on GM's legal staff. Because of sharp disputes over questions of privilege, the deposition was adjourned to the courtroom of Magistrate Judge Komives so that the magistrate judge would be available if needed.

On the second day of the Timm deposition, during a time when the magistrate judge was present, counsel for GM moved orally for an order sealing the deposition transcript until various objections regarding privilege could be resolved. GM proposed that the transcript "be kept confidential, to be used of course only by counsel in connection with legitimate purposes of this lawsuit, until such time as we could have an opportunity to have these matters heard." Defense counsel did not object to this, as long as it was understood that the transcript could be divulged to "any and all persons necessary with regard to the defense of this case." In response to a comment by GM about the scope of the quoted phrase, Mr. Robinson agreed that "persons necessary" did not include "every plaintiff's lawyer in this country that has a lawsuit against General Motors." In Mr. Robinson's words, "We're talking about the people that we need to defend this lawsuit."

The magistrate judge suggested limiting disclosure, temporarily, to the people then in the room. Mr. Robinson demurred, asserting a need to consult with other lawyers and expert witnesses before the scheduled discovery cutoff date of November 19. Amplifying on this point later in the day, Mr. Robinson told the magistrate judge that he needed to share the transcript with other attorneys who were working on the case, local counsel, attorneys in his office, expert witnesses, and defendant Ditlow himself.

The upshot of these discussions with the magistrate judge was an agreement that distribution of the transcript by the defense side would be limited in the manner outlined by Mr. Robinson until November 3, 1993, at which time the parties would give the magistrate judge copies of a proposed final protective order. An agreed "temporary protective order" to this effect was signed on October 29.

The temporary protective order provided, among other things, that pending entry of the final protective order the following persons would have access to the Timm deposition:

"a. The parties and their attorneys and office staff;

b. Attorneys on the Legal Staff of General Motors;

c. Specifically identified expert witnesses retained by the parties."

Counsel for the parties subsequently negotiated a final protective order that was signed by the magistrate judge on November 8, 1993. The final order is the one that allegedly was violated. It provided that the Timm deposition should be sealed and kept confidential, and that only persons described in the order should have access to the deposition or its contents. The language describing the persons to be allowed access included a new reference to "the deponent and his attorneys," but otherwise tracked the quoted language from the temporary order. "The parties and their attorneys and office staff" were still to be accorded access to the deposition.

Mr. Robinson, as he subsequently testified, instructed a young attorney in his office to send a copy of the protective order to a young attorney (Alpa Patel, presumably) at Mr. Ditlow's office in Washington. As soon as the Timm deposition was transcribed, it was sent to Mr. Ditlow's office too.

In accordance with standing instructions from Mr. Ditlow, Ms. Patel forwarded a copy of the Timm deposition to Mr. Butler's office in Georgia. Ms. Patel was aware of the protective order, according to Mr. Robinson, but "she just assumed that the order meant what it said, that it could be sent to their attorneys." There is no indication in the record that Mr. Robinson ever described to Ms. Patel or Mr. Ditlow the nuances of his discussion with Judge Hackett about GM documents being inspected by plaintiffs' personal injury lawyers, or the discussions with Magistrate Judge Komives about the terms of the temporary protective order.

Mr. Robinson knew that there was an arrangement of some kind under which Mr. Ditlow received information from Mr. Butler, but Robinson testified without contradiction that he did not realize that Ditlow and Butler had an attorney-client relationship in the defamation action. It was Robinson's impression, he testified, that the lawyers with whom Ditlow and the Center had been consulting

about the defamation action were lawyers with the Public Citizen organization.

During the second week of November, 1993, the defendants filed motions that contained unsealed excerpts from the Timm deposition. GM promptly moved for sanctions. The defendants disclosed that a copy of the Timm deposition had been given to Mr. Butler, whereupon GM filed a new motion for sanctions.

After two adjournments, a hearing on the motions was held before Judge Hackett in March of 1994. (Plaintiff Grace subsequently moved for an award of the attorney fees he incurred in connection with the hearing.) The court ultimately issued an opinion and order imposing sanctions against Messrs. Ditlow and Robinson on the basis of the dissemination of the Timm deposition to Mr. Butler and his firm. *Grace v. Center for Auto Safety,* 155 F.R.D. 591 (E.D.Mich.1994). Ditlow and Robinson were ordered to pay attorney fees of $36,961.69 incurred by GM, as well as attorney fees of $7,244 incurred by plaintiff Grace.[1] In addition, Ditlow and Robinson were each fined $5,000. Timely appeals have been taken from the orders imposing these sanctions.

## II

■ "In a civil contempt proceeding," we have said, "the petitioner must prove by clear and convincing evidence that the respondent violated the court's prior order." *Glover v. Johnson,* 934 F.2d 703, 707 (6th Cir.1991), citing *N.L.R.B. v. Cincinnati Bronze, Inc.,* 829 F.2d 585, 590 (6th Cir. 1987). The order must be "definite and specific," in the words of *Cincinnati Bronze,* 829 F.2d at 591. In a formulation used by other circuits, the order must be "clear and unambiguous." *Project B.A.S.I.C. v. Kemp,* 947 F.2d 11, 16 (1st Cir.1991) (citing numerous cases). "[U]nbroken lines of authority ... caution us to read court decrees to mean rather precisely what they say," and ambiguities must be resolved in favor of persons charged with contempt. *NBA Properties,*

*Inc. v. Gold,* 895 F.2d 30, 32 (1st Cir.1990) (Breyer, J.).

■ The order at issue in this case says rather precisely that "[t]he parties and their attorneys and office staff" are to have access to the Timm deposition. The district court thought that the order unambiguously limited dissemination of the deposition to parties, attorneys and office staff "in the *Grace* defamation case." *Grace,* 155 F.R.D. at 599. We agree. The district court also appears to have thought, however, that the reference to the parties' attorneys could only be a reference to attorneys who had filed appearances in *Grace* and who thus had an "official" role in the lawsuit. *Id.* at 559–560. Here we disagree.

The protective order does not clearly and unambiguously limit dissemination of the deposition to the parties' attorneys of record. Resolving any ambiguity in favor of those who are claimed to have been in contempt, we conclude as a matter of law that the order must be read as permitting dissemination of the deposition to anyone who was in fact functioning as an attorney for the defendants in *Grace,* whether in an "official" role or not.

We do not mean to suggest, of course, that Mr. Ditlow was free to send the Timm deposition to any personal injury lawyer in the country as long as he took the precaution of asking the lawyer for some free legal advice. The Patel affidavit shows without dispute, however, that Mr. Butler's firm had been assisting in the defense of the *Grace* case for months before Mr. Timm was deposed. The firm was still doing so when it received the deposition transcript, and it continued to do so thereafter. The record contains no evidence whatever to suggest that Ms. Patel and Mr. Ditlow turned to Mr. Butler for legal counsel in *Grace* as a smokescreen to mask a conscious violation of the spirit, if not the letter, of the protective order.

■ It is true that Mr. Butler and his firm received no legal fees from Mr. Ditlow and the Center, but the formation of an attorney-client relationship is not dependent on the

---

1. Mr. Grace's motion for attorney fees was granted in a separate order that has not been published.

payment of fees. *Simpson v. James,* 903 F.2d 372, 376 (5th Cir.1990); *Westinghouse Elec. Corp. v. Kerr–McGee Corp.,* 580 F.2d 1311, 1317 & n.6 (7th Cir.), *cert. denied,* 439 U.S. 955, 99 S.Ct. 353, 58 L.Ed.2d 346 (1978). Lawyers do sometimes provide free legal services out of altruism, after all, just as they sometimes provide free services when they have the kind of mutual back-scratching arrangement that seems to have existed between Mr. Butler's firm and the Nader organization.

It is also true that Mr. Robinson was unaware of the role the Butler firm was playing behind the scenes in assisting the *Grace* defense. Given the oral references to personal injury lawyers in the proceedings held prior to the entry of the protective order—references of which Mr. Ditlow and Ms. Patel knew nothing, as far as the record discloses—Mr. Robinson might have had an obligation to disclose Butler's role if he had known about it. But the fact that Robinson did not know that his client was receiving backroom assistance in the case from Butler does not strike us as clear and convincing evidence that Butler was providing no such assistance.

GM's strongest evidence that Butler may not have been functioning as a lawyer for the *Grace* defendants consists of a letter that Butler sent a GM lawyer on December 3, 1993, in connection with another pickup truck case pending in Georgia. The letter—written after Butler had already received the Timm deposition from Ms. Patel—asked GM for copies of all depositions taken in *Grace,* including Timm's, or for an agreement that "we [the Butler firm] may request and receive them from defense counsel in the *Grace* case." One might reasonably infer from the letter that either Mr. Butler did not think of himself as defense counsel in *Grace,* or he did

not want GM to know that he was functioning in that capacity.[2]

It is not outside the realm of possibility that Mr. Butler wanted to keep GM in the dark. If, as has sometimes been suggested, the Nader organization is sensitive about disclosing the level of support it receives from wealthy personal injury lawyers,[3] Mr. Butler may not have wished to disclose his in-kind contribution of legal services to the Center.

■ It is also possible, to be sure, that Mr. Butler really didn't view himself as a lawyer for the *Grace* defendants— either because he did not realize that a lawyer can serve as counsel to a litigant without being counsel of record, or for some other reason. "In determining whether an attorney-client relationship exists," however, "the focus is on the *client's* subjective belief that he is consulting a lawyer in the lawyer's professional capacity and his intent is to seek professional legal advice." *Grace,* 155 F.R.D. at 598 (citation omitted) (emphasis supplied). The Patel affidavit shows without contradiction that the Center was regularly seeking and obtaining professional legal advice on *Grace* from the Butler firm, and Mr. Ditlow's affidavit of January 26, 1994, shows that he and the Center were relying on the firm's assistance and counsel in the case. GM never refuted this showing that Ditlow and the Center had a subjective belief that they were consulting with the Butler firm in its professional capacity and intended to seek professional legal advice from the firm.

The district court found as a fact that the Butler firm had no role in the *Grace* lawsuit. *Grace,* 155 F.R.D. at 597, 599. The court's finding, in our view, was clearly erroneous. The Butler firm obviously did have a role in the lawsuit, and the role was sufficient to justify a belief by Ms. Patel that under the

---

**2.** It is also conceivable that Butler was scrupulously keeping his roles in the two cases separate, not wishing to take advantage, as counsel for the plaintiff in the personal injury case, of knowledge gained as counsel for the defendants in the defamation case. Mr. Butler himself, in an affidavit filed by the defendants with a brief opposing GM's motion for sanctions, professed to find it "difficult now to reconstruct the reasons I wrote the letter. . . ." The affidavit went on to suggest, however, that there was "some confusion" as to

what the protective order meant with respect to the use of the *Grace* deposition in other cases. "The surest way to eliminate any confusion or doubt," the affidavit said, "was to simply obtain GM's agreement. That was the purpose of the letter."

**3.** In 1994, according to Forbes magazine, Mr. Butler's earnings came to $4 million. *The Top Trial Lawyers,* Forbes, Nov. 6, 1995, at 160.

precise terms of the protective order she was free to forward the Timm deposition to the firm.

Our resolution of this question makes it unnecessary to address the issue of whether the district court erred in relying on its "inherent" power to punish litigation misconduct, as opposed to relying on the power conferred by 18 U.S.C. § 401(3). (Regardless of the source of the court's authority, in our view, violation of a definite and specific court order must be shown by clear and convincing evidence before sanctions can be imposed for violation of the order.) One further issue does need to be addressed, however.

█ In its unpublished order the district court granted attorney fees to plaintiff Grace on the basis of conduct by Messrs. Ditlow and Robinson that twice necessitated the adjournment and rescheduling of the hearing on GM's motions for sanctions. It is well established that an award of attorney fees as a sanction for delaying proceedings must be predicated on a finding of bad faith. See *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45–46, 111 S.Ct. 2123, 2133–34, 115 L.Ed.2d 27 (1991); *Monroe Auto Equipment Co. v. UAW, Local 878*, 981 F.2d 261, 270 (6th Cir.1992). Here the district court made no such finding, and the record contains no facts from which bad faith may be inferred. Although Robinson and Ditlow may have been negligent, there is nothing to suggest that they acted in bad faith.

**REVERSED.**