

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-15-1995

# Harris v City of Phila

Precedential or Non-Precedential:

Docket 94-1286

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation

"Harris v City of Phila" (1995). *1995 Decisions.* Paper 49.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/49

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT


No. 94-1286


MARTIN HARRIS, JESSE KITHCART, WILLIAM DAVIS,
RANDALL CUMMINGS, EVELYN LINGHAM, ESTRUS FOWLER,
TYRONE HILL, and NATHANIEL CARTER

v.

THE CITY OF PHILADELPHIA; JOAN REEVES, in her official
capacity as Commissioner of the Department of Human
Services of the City of Philadelphia; ALBERT F. CAMPBELL,
ROSITA SAEZ-ACHILLA, GENECE E. BRINKLEY, ESQ.,
REV. PAUL M. WASHINGTON, M. MARK MENDEL,
HON. STANLEY KUBACKI, MAMIE FAINES, each in his or her
official capacity as a member of the Board of Trustees of
the Philadelphia Prison System; J. PATRICK GALLAGHER, in
his official capacity as Superintendent of the Philadelphia
Prison System; HARRY E. MOORE, in his official capacity as
Warden of Holmesburg Prison; WILHELMINA SPEACH, in her
official capacity as Warden of the Detention Center;
PRESS GROOMS, in his official capacity as Warden of the
House of Corrections; RAYMOND E. SHIPMAN, in his official
capacity as Managing Director of the City of Philadelphia;
and HON. EDWARD G. RENDELL, in his official capacity as
Mayor of the City of Philadelphia,

                                        Appellants


On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 82-cv-1847)


Argued September 14, 1994

Before:  SLOVITER, Chief Judge, MANSMANN and
ALITO, Circuit Judges

(Filed  February 15, l995 )

John W. Morris
Philadelphia, PA  19102

Mark A. Aronchick
Gary A. Rosen (Argued)
Randy Karafin Hubert
Hangley Connolly Epstein
   Chicco Foxman & Ewing
Philadelphia, PA  19102

          Attorneys for Appellants

David Richman (Argued)
Philip H. Lebowitz
Sarah E. Ricks
Pepper, Hamilton & Scheetz
Philadelphia, PA  19103

          Attorneys for Appellees

## OPINION OF THE COURT

SLOVITER, Chief Judge.

In this appeal, the City of Philadelphia and its responsible officials (jointly City or Philadelphia) appeal from the order of the district court dated February 16, 1994 denying reconsideration of a $125,000 contempt fine imposed on them on June 16, 1993.  That fine was levied because the City defendants failed to comply with the court's earlier order requiring the City to maintain a 90 percent occupancy rate in a residential drug treatment facility.

The City and plaintiffs in this case, a class of inmates in the Philadelphia prison system who filed suit in 1982 claiming unconstitutional conditions of confinement, entered into a consent decree in 1986 (1986 Consent Decree).  That decree was partially superseded by a stipulation and agreement approved by

the district court in 1991 (1991 Consent Decree), see Harris v. Reeves, 761 F. Supp. 382 (E.D. Pa. 1991), under which the City was obliged to provide a 250-bed substance abuse and treatment facility.  This particular appeal arises out of that undertaking.

Today we also file two other opinions disposing of several related appeals by the City.  The most detailed recapitulation of the underlying facts appears in Harris v. City of Philadelphia, Nos. 93-1997, 93-2116, & 93-2117 (3d Cir. _____, 1995) (Harris V), an appeal from the imposition of stipulated penalties in the amount of $584,000 and the dismissal of the City's Motion to Modify the Consent Decree as a penalty for the City's lengthy delay in submitting a Facilities Audit and Ten-Year Plan.  We file as well an opinion in Harris v. City of Philadelphia, No. 93-1988 (3d Cir. _____, 1995) (Harris VII) (an appeal from the adjudication of contempt and imposition of fines arising out of designation of bailable pretrial detainees for release).  An earlier opinion was filed from a related appeal argued the same day.  See Harris v. City of Philadelphia, 35 F.3d 840 (3d Cir. 1994) (Harris IV).  This opinion will set forth only those facts necessary to decide the issues presented in this appeal.

I.

Facts and Procedural History

Paragraph 16 of the 1991 Consent Decree provides, in relevant part:

> Not later than April 3, 1991, defendants shall contract for and provide a minimum of 250 beds in a program or programs that provide alcohol and substance abuse

> rehabilitation, training and other support services. .
> . . . The beds and services provided pursuant to this
> Paragraph 16 shall be reserved for persons who would
> otherwise be committed to or retained in the custody of
> the Philadelphia Prisons. Defendants shall have
> discretion in selecting the program provider(s), but
> may not reduce or discontinue the provision of such
> programs without Court approval.

App. at 115-16.

It was understood that this program for alcohol and substance abuse rehabilitation was designed for 250 persons already in or sentenced to the Philadelphia prison system as an alternative to incarceration in existing facilities. To comply with paragraph 16, the City contracted with the Greater Philadelphia Center for Community Corrections (GPCCC) to provide the required 250 beds in a single facility.[1]

However, by June 13, 1991, the GPCCC facility was still not operational because necessary renovations had not been completed. At a status hearing on that date, the district court announced its intention to enter an order "that the 250 beds be available by June 30th. And that the City be fined for any day that the beds are available and it's not filled to 90 percent of capacity." Supp. App. at 969. Significantly, the City Solicitor, who was present, did not object to the proposed order but merely requested that the proposed date be extended. The relevant colloquy was as follows:

---

1 The GPCCC facility has since changed its name to the John Czmar Treatment Center. For convenience, we will continue to refer to it as the GPCCC facility.

MS. LILLIE:     [W]e could get to capacity in about 30 days, to 90 percent.

THE COURT:     Good.

MS. LILLIE:     And I would respectfully request that the point at which you are going to impose fines would be 30 days beyond today as opposed to June 30th.

                    *   *   *

THE COURT:     -- all right. . . .

MS. LILLIE:     Thank you, your Honor.

Supp. App. at 974.

     As a result, on July 2, 1991 the district court entered an order which provided, in relevant part:

     The 250 treatment beds that the City agreed to provide by April 3, 1991, pursuant to Paragraph 16 . . ., shall be available and the facility filled to at least 90% (225 residents) of capacity by July 15, 1991.

App. at 199 (referred to as the July 2, 1991 Order).  The order also provided that the City must pay a fine of $500.00 per day for every day after July 15, 1991 that 250 beds were not available or at least 90 percent occupied.  App. at 199-200.  The City neither objected to nor appealed from the district court's July 2, 1991 Order.

     On October 10, 1991, following a hearing, the district court held the City in contempt, imposing $44,000 in fines for the City's "continued failure" to fill the GPCCC facility to 90 percent of capacity.  App. at 201.  The City paid the fines and did not appeal that order.  On the same day, the district court

vacated the July 2, 1991 Order to a date certain[2] and suspended further accrual of fines until November 25, 1991 to allow the parties to develop a protocol for sending eligible inmates to the GPCCC facility at the time of sentencing. Because the protocol had not been completed as planned, the question of further fines did not arise at the November 25, 1991 hearing.

In the following months, the GPCCC facility population fluctuated but it was never again 225 after April 15, 1992. Supp. App. at 624 (Fortieth Report of Special Master). The special master repeatedly found that the City remained out of compliance with the July 2, 1991 Order. On July 17, 1992, after reviewing the special master's Thirty-Seventh Report, the district court issued a Rule to Show Cause ordering a hearing to determine whether the City should be fined an additional $37,000 for 74 days during which the GPCCC facility was not 90 percent occupied. Supp. App. at 1139. After the hearing, the court deferred until the next scheduled compliance hearing a decision on the amount of fines owed by the City, based on the City's representation that the GPCCC facility would begin accepting pretrial detainees to increase the occupancy level. Supp. App. at 1142 (Order of August 4, 1992).

The assignment of pretrial detainees to the GPCCC facility failed to raise its population above 225, and on October

---

[2] The vacation was until further order of the court "but no longer than the next status hearing," App. at 202, which was held on November 25, 1991. Such status hearings were held periodically.

16, 1992, the district court ordered the special master and an independent expert to evaluate the GPCCC program and recommend changes to make the program more effective. During the evaluation process, the court again deferred the imposition of fines. Supp. App. at 625 (Fortieth Report of Special Master). Meanwhile, conditions at the facility deteriorated to the point that the Philadelphia District Attorney refused to request assignment of inmates to it and state court judges discontinued making such assignments. See Supp. App. at 625-27 (Fortieth Report).

As the City acknowledged in its motion for reconsideration, there were "repeated reports of drug use, high walkaway rates, and acts of violence in the [GPCCC] facility." App. at 858. In addition, residents who violated facility rules and tested positive for drug use were discharged without sanctions. App. at 858-59. As a result, by May 19, 1993, the GPCCC facility's population declined to 34. Supp. App. at 626-27 (Fortieth Report).

By April 1993, the City expressed its intention to issue a Request for Proposal (RFP) seeking a facility to replace the GPCCC facility, and in May 1993 the City stopped making payments to GPCCC. Supp. App. at 625-26. As of May 19, 1993, the population of the GPCCC facility had been below 90 percent of capacity for 399 consecutive days, creating a potential liability by the City of $199,500 in fines. Supp. App. at 627.

As a result of the City's continued noncompliance with the July 2, 1991 Order, and after a hearing on June 11, 1993, the

district court fined the City $125,000, allowing a credit for time during which the special master and independent expert were evaluating the facility.  In its order, dated June 16, 1993, the district court tolled the further accrual of fines pending submission of the RFP by June 30, 1993.

The City filed a motion for reconsideration of the order imposing the $125,000 fine as a sanction, which the district court denied on February 16, 1994.  In its opinion, the district court held that the City had waived the opportunity to argue that the July 2, 1991 Order exceeded the scope of the 1991 Consent Decree, and that even if the 1991 Consent Decree did not support that order the City had still failed to comply with paragraph 16 because the GPCCC facility provided inadequate treatment services.

The City now appeals from the district court's order denying reconsideration.  We have appellate jurisdiction under 28 U.S.C. § 1291.  See Inmates of Allegheny County Jail v. Wecht, 874 F.2d 147, 152 (3d Cir.), vacated on other grounds, 493 U.S. 948 (1989); Stone v. City and County of San Francisco, 968 F.2d 850, 854 (9th Cir. 1992), cert. denied, 113 S. Ct. 1050 (1993).

## II.

### Discussion

The City raises four arguments on appeal. First, it argues that the Order of July 2, 1991 imposing the 90 percent occupancy requirement exceeded the scope of the Consent Decree. Second, it contends that the imposition of contempt sanctions was without adequate due process notice or hearing. Third, the City claims that it was impossible for it to comply with the July 2, 1991 Order because it lacked power to compel state court judges to assign inmates to the GPCCC facility. Finally, the City argues that plaintiffs have unclean hands and should be barred from any benefit from a contempt sanction.

### A.

According to the City, the district court impermissibly expanded the City's obligations beyond the "four corners" of the 1991 Consent Decree by requiring the City to ensure 90 percent occupancy of GPCCC. Normally, "[f]or the purposes of enforcement, a consent judgment is to be interpreted as a contract, to which the governing rules of contract interpretation apply." Harley-Davidson, Inc. v. Morris, 19 F.3d 142, 148 (3d Cir. 1994). The obligations imposed by a consent decree must be "discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it." United States v. Armour & Co., 402 U.S. 673, 682 (1971). As this court has said, "[t]he agreement memorializes the bargained for positions of the parties and should be strictly construed to preserve those . . . positions." Halderman v. Pennhurst State

Sch. and Hosp., 901 F.2d 311, 319 (3d Cir.), cert. denied, 498 U.S. 850 (1990).

However, we have no occasion on this appeal to decide whether the July 2, 1991 Order exceeded the scope of the 1991 Consent Decree, because the validity of that order is not open to collateral attack in a contempt proceeding for violating it. See Northeast Women's Center, Inc. v. McMonagle, 939 F.2d 57, 68 (3d Cir. 1991); Roe v. Operation Rescue, 919 F.2d 857, 871 (3d Cir. 1990); see also Walker v. City of Birmingham, 388 U.S. 307, 313–21 (1967). As we have stated, "'[i]f a person to whom a judge directs an order believes that order is incorrect the remedy is to appeal, but, absent a stay, he must comply promptly with the order pending appeal.'" United States v. Stine, 646 F.2d 839, 845 (3d Cir. 1981) (quoting Maness v. Meyers, 419 U.S. 449, 458 (1975)).

It is true, as the City notes, that we will review the validity of the underlying order in a contempt proceeding when the underlying order was not previously appealable and compliance would result in irreparable harm. See United States v. Pearce, 792 F.2d 397, 400 (3d Cir. 1986) (citing Maness, 419 U.S. at 460 and United States v. Ryan, 402 U.S. 530, 532–33 (1971)). However, even assuming that compliance would have resulted in irreparable harm, that exception is inapplicable here because the July 2, 1991 Order was previously appealable as an injunction under 28 U.S.C. § 1292(a)(1). See Harris IV, 35 F.3d at 844 (asserting appellate jurisdiction under section 1292(a)(1) over appeal of orders related to consent decree which imposed

affirmative duties on City); see also Sansom Committee v. Lynn, 735 F.2d 1552, 1553 (3d Cir.) (order extending a compliance deadline in a consent decree by 30 days was "in the nature of a preliminary injunction" and appealable under section 1292(a)(1)), cert. denied, 469 U.S. 1017 (1984).

The City claims that the Order of July 2, 1991 was not appealable because it provided that fines would be imposed in the future only if certain conditions were not fulfilled. This argument confuses appeal from final orders with appeal from injunctions. Generally, a party may not appeal from an otherwise final order awarding damages or fines until the damages or fines have been calculated, unless calculation would be a purely ministerial act. See Apex Fountain Sales, Inc. v. Kleinfeld, 27 F.3d 931, 934-35 (3d Cir. 1994). But the July 2, 1991 Order imposed an immediate duty on the City to open the GPCCC facility and fill it to 90 percent of capacity by July 15, 1991. The July 2, 1991 order thus satisfied the requirements of section 1292(a)(1) because it "grant[ed] relief [that] could be enforced pendente lite by contempt if necessary." Cohen v. Board of Trustees of Univ. of Medicine, 867 F.2d 1455, 1465 (3d Cir. 1989) (in banc). It was therefore appealable when entered.[3]

---

[3]    Because we hold the order was appealable as an injunction, we need not decide if it was also appealable as a final order under 28 U.S.C. § 1291, see United States v. Wheeling-Pittsburgh Steel Corp., 818 F.2d 1077, 1082 (3d Cir. 1987) (order modifying consent decree by indefinitely extending compliance deadline appealable as final order).

The City argues that it is not "incumbent upon [it] to file a Notice of Appeal from virtually every interlocutory order entered . . . to preserve its rights to appellate review," and that it may "wait to see which orders, in the ebb and flow of events, actually cause serious prejudice to the City and merit the attention of the Court of Appeals."  Reply Brief for City at 4.  We simply cannot accept the City's argument that it can pick and choose when to appeal from the entry of an injunction, an argument that ignores the mandatory nature of the time limits for filing a notice of appeal.  If a party could obtain appellate review of court orders simply by disobeying them at any time, the time limits for appeal mandated by Fed. R. App. P. 4(a) "would easily be set to naught," thus destroying "the finality of judgments of both appellate and trial courts."  Halderman v. Pennhurst State Sch. and Hosp., 673 F.2d 628, 637 (3d Cir. 1982) (in banc), cert. denied, 465 U.S. 1038 (1984); see also United States v. Millstone Enterprises, Inc., 864 F.2d 21, 23-24 (3d Cir. 1988).  Having failed to challenge the July 2, 1991 Order at the first available opportunity, the City may not now attack its validity.

B.

The City next argues that the district court imposed the contempt sanction without affording it adequate notice or hearing.  Our standard of review over this question of law is plenary.  United States v. Barnhart, 980 F.2d 219, 222 (3d Cir. 1992).  See also Epstein Family Partnership v. Kmart Corp., 13 F.3d 762, 765-66 (3d Cir. 1994).

The fundamental requirements of due process are notice and a meaningful opportunity to be heard, but the "concept is flexible, calling for procedural protection as dictated by the particular circumstance." Kahn v. United States, 753 F.2d 1208, 1218 (3d Cir. 1985). In a contempt case, the hearing must provide an opportunity to explain why contempt sanctions should not be imposed and create a record to facilitate appellate review. Newton v. A.C. & S., Inc., 918 F.2d 1121, 1127 (3d Cir. 1990).

The City raised no due process arguments in the district court, either at the June 11, 1993 hearing or in its motion for reconsideration. This court "generally refuses to consider issues raised for the first time on appeal." United States v. Frost, 999 F.2d 737, 744 n.4 (3d Cir.), cert. denied, 114 S. Ct. 573 (1993); see also Harris IV, 35 F.3d at 845. The City has put forward no reason why we should disregard our strong policy in favor of allowing district courts to decide such issues in the first instance when there was no obstacle to their review in the district court, and thus the City's waiver of its due process argument is a sufficient basis to reject its contention.

Alternatively, we hold that the City's notice argument fails on its merits. Having been held in contempt on October 10, 1991 for failure to comply with the 90 percent occupancy requirement, the City cannot now complain that it was unaware that its further failure to comply could be grounds for additional contempt sanctions. Moreover, the district court issued a Rule to Show Cause order on July 17, 1992, explicitly

requiring the City to show cause why it should not be held in contempt for noncompliance with the July 2, 1991 Order. In its order of August 4, 1992, the district court deferred a determination of the amount of fines to be imposed, based on the City's prediction that diversion of pretrial detainees to GPCCC would satisfy the 90 percent requirement, but the court's determination that the City would be fined for its noncompliance was not vacated.

In the circumstances, we find that the district court afforded ample notice to the City. The October 10, 1991 contempt order and the July 17, 1992 Rule to Show Cause notified the City that it could be held in contempt, and the August 4, 1992 order put the question of the amount of fines on the table at subsequent status hearings. Three weeks before the June 11, 1993 hearing, the special master's report informed the City that it remained out of compliance with the 90 percent requirement. At the hearing itself, the district court told the City that the City appeared to be in continuing violation of the July 2, 1991 Order. App. at 835.

In light of the ample notice previously provided and the continuing nature of the City's violation, due process did not require the district court to issue a further Rule to Show Cause or other formal written notice before holding the City in contempt in its order of June 16, 1993. Cf. American Fletcher Mortgage Co. v. Bass, 688 F.2d 513, 519 (7th Cir. 1982) (in civil contempt case, oral notice in open court, without written notice or service, satisfies due process).

The City also faults the district court for failing to hold an evidentiary hearing before holding it in contempt. At the hearing on June 11, 1993, the district court stated its inclination to impose fines for noncompliance with the July 2, 1991 Order, but told the City, "I'll hear anything you want to say." App. at 835.

Without seeking to call witnesses or requesting that the hearing be postponed until another time, the City then proceeded to present its defense to contempt. That defense consisted primarily of the argument that compliance was impossible because it could not compel the state courts to approve release of inmates to the GPCCC facility, as well as an attempt to shift blame to GPCCC for its failure to cooperate with the City. The City noted that it hoped to issue an RFP for replacement programs by the end of the month and to have the programs in place within 30 to 60 days after that, and it argued that "fining the taxpayers of the City of Philadelphia . . . is not an appropriate sanction, because what happened here was in very large part beyond the ability of the City of Philadelphia to address." App. at 836-37.

On this record, we find that the district court afforded the City a sufficient hearing before finding it in contempt. The City had ample opportunity to "explain the conduct deemed deficient," Newton, 918 F.2d at 1127, and indeed presented

a vigorous defense.  An evidentiary hearing would have added nothing of consequence to the record.[4]

The problems at the GPCCC facility that caused the District Attorney to stop recommending assignment there and the state courts to deny petitions for such assignments are well documented.  The City does not dispute that the GPCCC facility's population fell below 90 percent of capacity during the relevant time period, and effectively concedes that "there were no disputed issues of fact related to the July 2, 1991 Order." Reply Brief for City at 11.  It argues only that it cannot be held liable for "judicial resistance to paroling inmates to the facility."  Id.  Because the relevant facts are undisputed, the only question remaining is whether those facts justified a finding of contempt.  In such a case, no evidentiary hearing is necessary.  See Alexander v. Chicago Park Dist., 927 F.2d 1014, 1025 (7th Cir. 1991) (due process does not require evidentiary

---

[4]  In its brief, the City pounces on the statement by the district court that "I don't think that this is an appropriate time to hear the allegations or decide wherein the merit lies." App. at 844.  That statement concerned the separate issue of responsibility between the City and its vendor, GPCCC.
On June 30, 1993, the district court proceeded to hold a limited hearing on GPCCC's claims.  Although the City faults the district court for relying on evidence from that hearing, it is undisputed that the state judges declined to assign inmates to GPCCC because of concern about the program.  GPCCC officials testified that "severe underfunding" from the City prevented them from providing adequate services.  Addendum to Brief for City at A-8.  This testimony was cumulative of similar evidence appearing in a City Department of Public Health evaluation of the GPCCC facility attached as an exhibit to the City's motion for reconsideration.  See App. at 898.

hearing prior to imposition of contempt sanctions where relevant facts not in dispute), cert. denied, 112 S. Ct. 1262 (1992).

The district court held that, in the alternative, the City could be held in contempt for violating paragraph 16 of the 1991 Consent Decree, because the GPCCC facility did not provide adequate "alcohol and substance abuse rehabilitation, training and other support services" as required by paragraph 16. We need not decide whether that determination should have been preceded by a hearing notwithstanding the City's concession that the GPCCC facility was in "undisputed decline," had "inadequate security," was beset with "rampant drug use," and had proved "inadequate." See Brief for City at 28, 13, 16. Instead, we rely on the district court's finding that the City was in violation of the July 2, 1991 Order, a finding made after according the City its full due process rights.

C.

Turning to the merits, we review a finding of contempt for abuse of discretion, reversing only for an error of law or clearly erroneous finding of fact. United States v. Sarbello, 985 F.2d 716, 727 (3d Cir. 1993).[5] The City's defense is limited

_____

[5] The City contends that our standard of review over the initial finding of contempt is plenary, citing American Greetings Corp. v. Dan Dee Imports, Inc., 807 F.2d 1136, 1140 (3d Cir. 1986). As we explain in Harris v. City of Philadelphia, Nos. 93-1997, 93-2116, & 93-2117 (3d Cir. _____, 1995) (slip op. at __), American Greetings does not support the City's argument. Briefly, in American Greetings, we reversed a finding of contempt that was based on a preliminary injunction that did not provide sufficient notice of the conduct it prohibited. See 807 F.2d at 1147-48. Whether the notice provided conformed to legal requirements is a question of law over which we retain plenary review. American Greetings thus holds only that we exercise

to whether it was possible to comply with the order.  See Wecht,

874 F.2d at 152.  A finding of contempt must rest on clear and

convincing evidence.  Robin Woods Inc. v. Woods, 28 F.3d 396, 399

(3d Cir. 1994).  The City may escape contempt by showing that it

could not possibly comply with the court's order despite making

all reasonable efforts to do so.  Citronelle-Mobile Gathering,

Inc. v. Watkins, 943 F.2d 1297, 1301 (11th Cir. 1991) (citing

Ryan, 402 U.S. at 534).

        The City claims that it has a complete defense to

contempt because under 61 Pa. Cons. Stat. Ann. § 785 it may not

transfer pretrial detainees without the consent of the sentencing

court.  It argues that it must rely on parole petitions to

individual state courts to fill a drug treatment facility with

prison inmates, and these courts are now refusing such petitions.

Therefore, it claims that the district court impermissibly held

it in contempt as a "hostage" to the actions of third parties

beyond its control.  See United States v. International Bhd. of

Teamsters, 899 F.2d 143, 147 (2d Cir. 1990) (defendant cannot be

held in contempt for actions of third parties when defendant has

no legal power to compel them to act otherwise); Newman v.

Graddick, 740 F.2d 1513, 1528 (11th Cir. 1984) (defendant cannot

be held in contempt for failing to prompt government officials to

---

plenary review over conclusions of law underlying a finding of
contempt, a conclusion entirely consistent with Sarbello.
Nothing in American Greetings suggests that we exercise plenary
review over the district court's findings of fact or ultimate
finding of contempt except to the extent that the finding of
contempt rests on an erroneous conclusion of law.

correct violation of court order when defendant has no power to control actions of officials).

Of course, the City cannot directly compel state courts to assign inmates to a treatment facility. But the City's undertaking to establish a treatment facility pursuant to the 1991 Consent Decree imposed on it an obligation to use all reasonable efforts to provide a treatment facility to which state courts could be expected to assign inmates. That would necessarily be one where residents could not routinely circumvent security, use drugs, attack each other in the building, or walk away at will. This obligation includes contracting with an appropriate facility, funding it at the level necessary to provide adequate security and treatment, and closely monitoring performance under the contract.

The evidence from the City's own Department of Public Health as well as Donald Stoughton, the court's independent expert, showed that the GPCCC facility was an inappropriate facility from the outset. According to the Department, GPCCC initially told the City it could handle only 125 residents, but the City insisted that it take 250, though 250 residents exceeded the number that the Department considered appropriate for the site. App. at 885, 895. Moreover, Stoughton noted the lack of "perimeter security" and the "unrestricted and easy access to and from the public streets," and concluded that the GPCCC facility is "not designed, equipped, staffed or operated as a secure detention facility." App. at 902-03.

There is also evidence that the City underfunded GPCCC and failed to develop performance standards or to monitor GPCCC's performance under the contract. The Department of Public Health reported that GPCCC was not funded at a level "in line with other residential programs in the area." App. at 898. Stoughton found a "lack of measurable performance standards and program criteria." App. at 903. He concluded by stating, "It is essential to develop and maintain a performance monitoring process to assure that the city is getting what it is paying for." Id. Finally, both Stoughton and the Department of Public Health noted the inadequate number of therapists available and questioned whether GPCCC was capable of providing effective substance abuse treatment as currently staffed.

Because the problems at the GPCCC facility stemmed at least partly from the City's own acts and omissions, the City cannot demonstrate that it exhausted all reasonable efforts to comply with the 90 percent occupancy requirement. Instead, the City helped create the situation leading the state court judges to refuse to assign inmates there, and then it failed to explore alternative programs until the middle of 1993, when it finally issued a new RFP.

In such circumstances, the City has no viable defense in its argument that it lacked power to compel the assignment of inmates. In Glover v. Johnson, 934 F.2d 703 (6th Cir. 1991), the court was confronted with an analogous situation and refused to recognize a defense of impossibility. In that case, the district court had directed Michigan prison officials to provide equal

educational opportunities to male and female prison inmates, after finding the officials guilty of equal protection violations. On appeal from the district court's contempt order and sanctions imposed because defendants had failed to contract with local colleges to provide degree programs in women's prisons, defendants contended that they were "unable to comply with the court's orders . . . because the orders required the cooperation of colleges and educators outside their control." Id. at 708. Defendants argued that because the legislature failed to appropriate sufficient funds, colleges did not find it "financially attractive" to offer degree programs in women's prisons. Id. at 711.

The appeals court upheld the finding of contempt because the record was "devoid of any evidence" that defendants exhausted all reasonable efforts to design degree programs for female inmates that would be financially attractive. Id. Defendants neither provided support nor sought funding for education of female inmates, though they sought funding for male inmates. Id.

Like the Sixth Circuit in Glover, we find the City's argument disingenuous. Because the City directly contributed to the state courts' loss of confidence in GPCCC, it cannot now complain that its hands were tied by the state courts' refusal to cooperate. We cannot therefore say that the district court abused its discretion in holding the City in contempt.

D.

Lastly, the City claims that plaintiffs should not benefit from the contempt order because of their unclean hands. Specifically, the City argues that by walking away from the GPCCC facility, certain inmates have demonstrated sufficient "fraud, unconscionability, or bad faith" to bar enforcement of the July 2, 1991 Order. See S & R Corp. v. Jiffy Lube Int'l, Inc., 968 F.2d 371, 377 n.7 (3d Cir. 1992). Though the district court did not address the unclean hands issue, we will resolve it on appeal in the interests of judicial economy and because the unclean hands doctrine ensures that courts protect "'their own integrity' and . . . avoid[] becoming 'the abettor of iniquity.'" Northeast Women's Center v. McMonagle, 868 F.2d 1342, 1354 (3d Cir.) (quoting Monsanto Co. v. Rohm & Haas Co., 456 F.2d 592, 598 (3d Cir.), cert. denied, 407 U.S. 934 (1972)), cert. denied, 493 U.S. 901 (1989).

We are most reluctant to allow the misconduct of one or more class members to adversely affect the position of a class of plaintiffs.[6] The members of the plaintiff class who walked away from the GPCCC facility will not necessarily benefit from their allegedly inequitable conduct by our affirmance of the order at issue. Therefore, even if the isolated acts of certain members

---

[6] This case is unlike Gaudiosi v. Mellon, 269 F.2d 873 (3d Cir.), cert. denied, 361 U.S. 902 (1959), where we affirmed the district court's dismissal of a suit arising out of a proxy contest because the plaintiff who had deliberately attempted to intimidate stockholders to vote for his election as director would have become a director despite his unclean hands if the claims of his co-plaintiffs, who were not implicated in his conduct, were not also dismissed. Id. at 882.

of the plaintiff class reflect fraud, unconscionability, or bad faith, those acts do not justify denying relief to the plaintiff class as a whole, which has not been shown to have acted in bad faith.

## III.

## Conclusion

For the foregoing reasons, we will affirm the district court's order of February 16, 1994 denying the City's motion to reconsider the order of June 16, 1993 imposing fines of $125,000 on the City as a sanction for contempt for its violation of the district court's order of July 2, 1991, which the City had not previously appealed.